572 F.Supp. 402 (1983)
Jimmy EASLEY, Andre Griffin, and Patricia Murphy, Plaintiffs,
v.
ANHEUSER-BUSCH, INC., Defendant.
No. 82-1316C(3).
United States District Court, E.D. Missouri, E.D.
August 30, 1983.
*403 *404 Kenneth M. Chackes, Michael J. Hoare, Chackes & Hoare, St. Louis, Mo., for plaintiffs.
Christopher M. Smith, Donald L. McCullin, Wilson, Smith & McCullin, St. Louis, Mo., for defendant.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court for a decision on the merits following a three-day bench trial conducted March 23, 24, and 25, 1983. Plaintiffs seek compensatory and injunctive relief against the defendant for *405 alleged violations of their civil rights in connection with certain hiring practices, pursuant to 42 U.S.C. §§ 1981 and 2000e-2, et seq.
Having considered the pleadings, trial testimony, exhibits, stipulations, and memoranda of the parties, and being fully advised in the premises, the Court hereby makes and enters the following findings of fact and conclusions of law.

Findings of Fact

A. Parties and Jurisdiction

1. Plaintiffs, Jimmy Easley, Andre Griffin, and Patricia Murphy, are black citizens of the United States. Stipulation of Uncontested Facts, filed March 11, 1983 (hereinafter Stip.), ¶ 1.
2. The defendant, Anheuser-Busch, Inc., is a Missouri corporation doing business in the City of St. Louis, Missouri, where it operates a brewery. At the times germane to this action, defendant continuously employed more than fifteen persons and was engaged in an industry affecting commerce. Stip. ¶ 2.
3. Plaintiff Easley filed a charge of race discrimination against defendant with the United States Equal Employment Opportunity Commission (EEOC) on October 16, 1979, less than 180 days after he was administered defendant's pre-employment test on June 8, 1979. The charge was amended November 21, 1979. Plaintiffs' Exs. 1 and 2. Plaintiff Griffin filed a similar charge with the EEOC on July 27, 1979, less than 180 days after being tested on May 18, 1979. After finding reasonable cause to believe that the charges of plaintiffs Easley and Griffin were true, and failing conciliation with the defendant, the EEOC issued to each plaintiff a Notice of Right to Sue. Both notices were received May 17, 1982. Plaintiffs' Exs. 3, 4, 5, and 8. This action was timely filed August 16, 1982, the previous day being a Sunday.
4. Plaintiff Murphy filed a charge of race discrimination against defendant with the EEOC on November 17, 1980. After finding reasonable cause to believe that plaintiff Murphy's charge was true, and failing conciliation, the EEOC issued to Murphy a Notice of Right to Sue on June 14, 1982. Plaintiffs' Exs. 6, 7, and 9; Stip. ¶ 4.

B. Plaintiffs' Prima Facie Cases of Discrimination

5. Each plaintiff submitted a written application for employment as a bottler. Murphy's application was submitted September 19, 1978, Plaintiffs' Ex. 14; Easley's, March 28, 1979; and Griffin's, April 5, 1979. Stip. ¶ 5.
6. Plaintiffs were administered defendant's written pre-employment test package for bottlers on dates scheduled by the defendant. Easley was tested June 7, 1979; Griffin, May 18, 1979; and Murphy, May 22, 1979. Stip. ¶ 6; Plaintiffs' Ex. 13.
7. Plaintiffs Easley and Griffin each failed to achieve a passing score on defendant's test, and, as a result, were eliminated from further consideration for a position with defendant. Stip. ¶ 7.
8. Easley and Griffin were qualified to perform defendant's bottler job. Defendant's plant employment coordinator, Harold Gartner, who worked for the company for over twenty-five years, was responsible for hiring bottlers at defendant's St. Louis brewery during the late 1970s and into the early 1980s. Gartner testified that he was involved in the hiring process both before and after the testing program was instituted (Tr. 1-19), and that the bottler's job was an unskilled, entry level position for which 99% of the general population was qualified. He also stated that competence in minimal entry level factory work would indicate an ability to perform the bottler's job. At the time of their applications, both Easley and Griffin had worked in factories for several years. Gartner testimony (Tr. 1-18, 1-20, 1-21); Griffin testimony (Tr. 2-42 to 2-44); Easley testimony (Tr. 2-82 to 2-85).
9. Plaintiff Murphy passed the defendant's bottler's test, was subsequently interviewed and passed at least one physical examination. Gartner determined that she *406 was fully qualified for a job as a bottler. Despite her qualifications, Murphy was never hired by the defendant. Stip. ¶ 8; Murphy testimony (Tr. 2-10); Plaintiffs' Exs. 15 and 17. Under the circumstances, no other conclusion can be made but that she was rejected by the defendant employer.
10. Between February 1979 and February 1980, defendant hired over 300 bottlers. Plaintiffs' Exs. 13 and 29.
11. The pre-employment test package given to plaintiffs consisted of six parts: Production Problems (PP), Code Interpretation (CI), Production Arithmetic (PA), Oral Instructions (OI), Lab Math (LM), and Recorded Readings (RR). Only the scores on the first four of those tests were used in the bottler selection process during the year prior to March 1, 1980. In order to pass the entire test, an applicant had to either (1) achieve a designated cut-off score (100%) on three of the tests, or (2) achieve the cut-off score (100%) on two of the tests and score within 80% of the cut-off score on the remaining two tests. Stip. ¶ 9; Plaintiffs' Ex. 12.
12. Passing defendant's pre-employment test was a necessary prerequisite for further consideration for employment as a bottler during the entire time it was administered, from February 1979 through February 1980, the last time defendant hired new bottlers. Stip. ¶ 10.
13. Before it implemented its written pre-employment test as a selection device for bottlers, defendant knew of the likelihood that it would have an adverse impact on black applicants. Gaydos testimony (Tr. 2-193). That written paper-and-pencil tests generally disqualify a higher percentage of blacks than whites is widely known by those in the testing and employee selection fields. Gaydos, id.; Decker testimony (Tr. 1-124 to 1-126).
14. The four-part test package had a material adverse impact on black bottler applicants. Of the approximately 1,500 applicants tested (679 black, 798 white), only 30% of the black applicants passed the test, whereas 50% of the white applicants passed. Under EEOC's "four-fifths" or "80%" rule, since less than 40% (four-fifths of the white pass rate) of the blacks passed the test, the test has a material adverse impact.
Under the chi-square test of statistical significance, the probability that the difference in pass rates was the result of chance rather than race is less than one in 1,000. Applying the standard deviation method, comparing the expected pass rate for blacks (if race were not a factor in passing the test) to the actual or observed pass rate for blacks, the difference is 6.64 standard deviations. Plaintiffs' Ex. 13; Decker testimony (Tr. 1-80 to 1-83). See Plaintiffs' Ex. 8.
15. Plaintiffs' Exhibit 13 consists of a log of bottler applicants tested during 1979, and indicates the race of each applicant: in the "race" column a check under "C" or no entry means Caucasian; "N" means Negro. Voisey deposition, page 60, lines 15-23. Plaintiffs' Exhibit 13 is the only available evidence regarding bottler applicants who were disqualified during the hiring process. Despite the pendency of plaintiffs' EEOC charges and this lawsuit, other data had been purged. Voisey deposition, pp. 57-58. EEOC regulations require maintenance of "all personnel records relevant to the charge," including "application forms and test papers completed by an unsuccessful candidate and by all other candidates for the same position." 29 C.F.R. § 1602.14(a).
16. Defendant's overall selection process for bottlers had a material adverse impact on black applicants during the 1979-80 hiring period.
"Adverse impact" has been defined under the EEOC's Uniform Guidelines on Employee Selection Procedures as:
A substantially different rate of selection in hiring, promotion, or other employment decision which works to the disadvantage of members of a race, sex, or ethnic group.
29 C.F.R. § 1607.16B.
Plaintiffs' expert witness, Philip Decker, testified that the overall selection rate for black applicants was 9.1% (62 of 679 applicants), whereas the hiring rate for white applicants was 35.1% (280 of 798 applicants). *407 In order to have satisfied the "four-fifths" ("80%") rule, the selection rate for blacks would have had to be 28.1%. Under the chi-square test, the probability that the difference in selection rates would occur by chance rather than because of race is less than one in 1,000. And using the two-standard deviation test, the difference between the expected selection rate for blacks and the observed selection rate for blacks is 8.64 standard deviations. Decker testimony (Tr. 1-77 to 1-80).
17. Of those applicants who passed the first hurdle in defendant's selection processthe written test  the hiring rate for blacks (30.4%) was substantially smaller than the hiring rate for whites (70.2%). Decker testimony (Tr. 1-85); see also Tr. 1-117 to 1-119.
18. Plaintiffs also produced evidence showing that (a) on average, black applicants were required to wait longer to be tested (214.2 days versus 101.6 days for white applicants); (b) they were generally tested later in the hiring period; and (c) as a result, their eligibility was in issue at a time when most of defendant's hiring had been achieved.
Testing occurred from February through December, 1979. With the exception of bottlers who were hired in February 1980, defendant's hiring activity was completed by June 24, 1979. Plaintiffs' Ex. 29; see also Plaintiffs' Exs. 31 and 13. Of all white applicants tested in 1979, 90.1% were tested between February and May. Of the black applicants, 41.6% were tested during the same period. Breaugh testimony (Tr. 1-146 to 1-152).
19. Defendant's employment coordinator, Gartner, testified that the racial composition of applicants was knowingly considered in processing applicants. The testimony indicated that the identification and coding of applicant files by race was initiated to monitor and aid minority recruitment efforts. Gartner testimony (Tr. 1-24 to 1-26, 1-34, 2-181 to 2-182). Nevertheless, defendant's evidence failed to refute or explain the racial disparities in test scheduling and is contradicted by the ultimately adverse impact which resulted under the testing program. E.g., Breaugh testimony (Tr. 1-152 to 1-154).
20. The EEOC determined that there was reasonable cause to believe that the company discriminated against plaintiff Murphy on the basis of race. Plaintiffs' Ex. 9. In announcing its determination, the Commission stated:
The data on Black hires raises the inference that Respondent has intentionally limited Black hires to Standard Metropolitan Statistical Area availability, despite its actual applicant pool.
Id. See also Plaintiffs' Ex. 8.
Defendant's own evidence in this action indicated that such a goal or limitation was intentionally imposed in hiring bottlers without regard to the percentage of blacks in the applicant pool. Williams testimony (Tr. 3-8, 3-14).

C. Plaintiff Patricia Murphy

21. Defendant's evidence failed to establish any reason for its failure to hire plaintiff Murphy. Presumably, defendant relies on the availability of jobs following June 14, 1979. See Defendant's Ex. A; Defendant's post-trial brief at 4. This inference fails to articulate a legitimate non-discriminatory reason. Murphy's application was on file beginning September 19, 1978. Bottlers were hired as early as October 15, 1978, and Murphy was qualified as stipulated by the parties.

D. Plaintiffs Jimmy Easley and Andre Griffin

22. Without resort to validation materials concerning the testing program, the EEOC found that:
[I]t is reasonable to conclude that cause exists to believe that Respondent has engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964 by maintaining both a testing policy and a selection procedure which discriminate against the Charging *408 Parties and similarly situated Blacks, as a class.
Plaintiffs' Ex. 8.
23. Without regard to the weight given such findings, in an arbitration proceeding conducted prior to this action the arbitrator found that two parts of the four-part test then administered were not sufficiently job-related. As such, the entire test package would be invalid in light of the applicable scoring procedure. Defendants' Ex. C at 13.
The arbitrator found that two parts of the test, Production Arithmetic (PA) and Production Problems (PP), were job related, but expressed doubts as to whether adequate time limits were applied in respect to an applicant's completion of these tests. Id. at 10-12.
24. Plaintiffs' expert witness, Dr. James Breaugh, an industrial psychologist on the faculty of the University of Missouri-St. Louis, testified that, in his opinion, the four-part test package was not a valid selection device. In his opinion, the two parts of the test found by the arbitrator to be job-related were not a valid selection device. Breaugh testimony (Tr. 3-50 to 3-52). He stated that he examined all of the validation materials which were made available by the defendant, and that defendant's job analysis was insufficient because it was incomplete, described only a sample of the 53 different jobs performed by bottlers, and contained no suggestion of the relative importance of identified work behaviors. Breaugh testimony (Tr. 3-52 to 3-54).
25. Defendant attempted to show that the test package was designed by a qualified industrial psychologist, was based on actual job requirements as observed by its employee expert, and appropriately tested and disclosed job-related qualities necessary for work as a bottler. This approach focuses on the content validity of the test.
26. At trial, the Court granted plaintiffs' motions in limine with respect to defendant's expert testimony because the defendant failed to comply timely and properly with Fed.R.Civ.P. 26(b)(4), Fed.R.Evid. 705, Rule 13 of the Rules of the United States District Court for the Eastern Judicial District of Missouri, and the Court's order relating to trial entered November 10, 1982. The Court noted on the record that the defendant had not adequately responded to inquiry number 12 of plaintiffs' first interrogatories to defendant, filed April 16, 1982. (Tr. 2-183 to 2-188); Gaydos testimony (Tr. 2-203 to 2-205); Seeskin testimony (Tr. 2-205, 2-221, 2-222, 2-223).
On defendant's offer, the Court received Plaintiffs' Ex. 11, subject to the hearsay objection of plaintiffs. The plaintiffs did not seek to introduce this exhibit in evidence during their case-in-chief or rebuttal. The Court notes that the receipt of this exhibit under the circumstances previously discussed in this ¶ 26 has the tendency to erode compliance with Fed.R.Civ.P. 26(b)(4), Fed.R.Evid. 705, and Local Rule 13. By offering one of plaintiffs' own exhibits, defendant's counsel sought to circumvent their failure properly to designate expert witnesses and the Court's order in limine. Despite these considerations and overruling plaintiffs' objection, the Court will receive plaintiffs' Exhibit 11 noting the well-established rule in this circuit that the erroneous reception of evidence in nonjury cases will not result in reversal unless it appears that the competent evidence is insufficient to support the judgment entered, or that the Court was induced by incompetent evidence to make an essential finding which it would not otherwise have made. Lovett v. Shuster, 633 F.2d 98, 103 (8th Cir.1980).
27. The Court finds that it is incumbent to note several matters concerning the conduct of trial. First, defendant's counsel exhibited a pattern of behavior apparently designed to delay, if not to deny, the plaintiffs their day in court on a footing equal to that of all other litigants. This cause was set for trial March 21, 1983. On defense counsel's request, and despite the availability of competent alternative counsel, a continuance to March 23 was granted on the advice that defendant's counsel, Christopher Smith, had been exposed to chickenpox. Following Mr. Smith's late arrival on the morning of March 23rd, the case was tried *409 without further incident due to any illness. During the course of trial, defense counsel's interrogation of witnesses sometimes indicated a lack of adequate preparation, and the defendant failed properly to designate its expert witnesses prior to trial, necessitating the foreclosure of some testimony pursuant to plaintiffs' motions in limine. Defense counsel failed to have witnesses available so as to facilitate a prompt hearing of this matter.
28. Defendant failed to produce sufficient evidence that a thorough job analysis was performed in connection with the development or validation of the test. The evidence failed to show that a job analysis was performed which analyzed "the important work behavior(s) required for successful performance and their relative importance." See 29 C.F.R. § 1607.14C(2). Plaintiffs' expert, Breaugh, who examined all of the validation materials which were made available by defendant, testified that the job analysis was insufficient because it was incomplete, described only a sample of the 52 different jobs performed by bottlers, and contained no suggestion of the relative importance of identified work behaviors. Breaugh testimony (Tr. 3-52 to 3-54).
29. Defendant failed to demonstrate that the test measured a representative sample of important attributes of the bottler's job. See 29 C.F.R. §§ 1607.5B, 1607.14C(1) and (4).
30. Breaugh testified that defendant's test material identified 53 separate jobs performed by bottlers, for which a total of 13 work factors or behaviors were necessary. Of those 13 factors, the four-part test purported to measure only six. The other seven factors were either learned on the job or were determined to be not testable. Included in the seven factors not tested was vigilance, which was determined by defendant to be the most important factor affecting successful job performance. (Tr. 3-54 to 3-55, 3-60 to 3-64.)
31. Defendant's evidence did not establish that the test program closely approximates the tasks performed on the job. See 29 C.F.R. § 1607.14C(4). Breaugh testified and defendant failed to refute that its testing procedure placed too great an emphasis on writing and following instructions. (Tr. 3-66). For example, the PP test purported to measure the applicant's ability to tend a production line, identify problems and take appropriate action. The evidence tended to show that a paper-and-pencil test does not closely approximate the work of tending a production line.
32. Defendant was unable to prove that the cut-off scores for successful completion of the tests were appropriately set. Plaintiffs' evidence indicated they were inappropriate. Breaugh testimony (Tr. 3-55 to 3-57).
33. The evidence tended to show that under the circumstances, a follow-up criterion-related study was necessary to establish the validity of defendant's test because the test purported to measure "knowledges, skills or abilities which an employee will be expected to learn on the job" and because part of the test purported to measure aptitude. See 29 C.F.R. § 1607.14C(1); Breaugh testimony (Tr. 3-64 to 3-69). Under the Guidelines, a test which purports to measure such things "cannot be supported solely or primarily on the basis of content validity." Id. Defendant's evidence did not indicate that it attempted to conduct such a follow-up validity study as had been suggested by Dr. Fred Sale, defendant's psychologist-consultant and developer of the original test program. See Breaugh testimony (Tr. 3-52, 3-89).
34. Defendant failed to produce adequate documentation as to the validity of its test. See 29 C.F.R. § 1607.15A(3) and C. The need for such documentation would normally be triggered by the existence of adverse impact in a total selection process and adverse impact in a component of that process, such as the written test. See 29 C.F.R. § 1607.15A(3).
35. Defendant failed to offer sufficient evidence of the reliability of its test. See 29 C.F.R. § 1607.14C(5). Breaugh testified that in the materials he reviewed, there was evidence that the test was not a reliable selection procedure under the minimum *410 standards accepted in the employment testing field. Breaugh testimony (Tr. 3-58 to 3-59).
36. An alternative selection procedure, without the same adverse impact on black applicants, was available to the defendant. Before the formal testing procedure, it hired bottlers simply on the basis of a review of their applications and one or more interviews. Defendant's plant employment coordinator, Gartner, testified that as far as he was aware the bottlers he hired under that system performed their jobs in a satisfactory manner. Gartner's boss, Dennis Voisey, testified that there were some problems with bottlers hired under that system, but due to the large variety of different tasks bottlers would be called upon to perform, the defendant was able to accommodate the less competent employees without having to terminate them. Under that hiring system, in 1978 a total of 427 bottlers were hired, 157 (36.7%) of whom were black and 270 (63.2%) of whom were white. That hiring ratio is far better than the ratio defendant obtained under its 1979 formal testing program which resulted in the hiring of 342 bottlers, of whom 62 (18.1%) were black and 280 (81.9%) were white. Gartner testimony (Tr. 1-19 to 1-20, 1-29 to 1-30, 1-57, 1-60); Voisey testimony (Tr. 3-125 to 3-129); Plaintiffs' Ex. 11, vol. 2, p. 251; Decker testimony (Tr. 1-77).
37. The racial discrimination practiced by defendant in the hiring of bottlers in 1979-80 was intentional. This is evidenced by gross statistical disparities in hiring and in scheduling applicants for testing, which resulted in the ineligibility of a majority of black bottler applicants. The Court can only conclude that this was the result of conscious practice.
Even in February 1980 when defendant did have an equal number of black and white applicants fully qualified and processed for hiring, it hired eight blacks and 38 whites. Plaintiffs' Ex. 29. Defendant's Exhibit A shows 60 whites and 61 blacks had taken physicals. Defendant's selection and use of a written test which it knew in advance would have an adverse impact on blacks and which resulted in a black/white hiring ratio of less than half of the ratio under its informal selection process further substantiates intentional conduct.

E. Damages

38. Plaintiff Murphy applied for employment with defendant on September 19, 1978. On October 15, 1978, defendant hired 27 bottlers. Plaintiffs' Ex. 29. Absent discrimination, Murphy should have been hired on that date. Bottlers hired on October 15, 1978, have earned gross wages ranging from $13,911.44 to $18,580.41 through 1982. Second Stipulation of Uncontested Facts, filed May 2, 1983. Plaintiff Murphy's actual loss is the amount she would have earned working for the defendant on weekend shifts, while retaining her other employment. Murphy testimony (Tr. 2-16 to 2-17, 2-35 to 2-36); Gartner testimony (Tr. 1-28).
39. Defendant's attendance records for employees hired October 15, 1978, tended to show that substantial amounts of weekend work would have been available to plaintiff and would have permitted her to remain employed during the regular work week at her then present employment.
For example, defendant's employee Durbin began work on October 15, 1978, a Sunday. Between that date and the end of 1981, Durbin earned a total of $15,772.98 from employment with the defendant for all days worked, whether weekend or otherwise. Second Stipulation of Uncontested Facts.
If plaintiff Murphy had worked the same weekend days on which Durbin worked from October 15, 1978, through 1981, she would have earned $113.58 in 1978, $7,762.86 in 1979, $1,775.47 in 1980, and $2,879.28 in 1981, for total gross earnings of $12,531.19. She is therefore entitled to an award of $12,531.19 as and for back pay.
40. Plaintiffs Easley and Griffin applied for employment with defendant on March 28 and April 5, 1979, respectively. The next hiring date thereafter was April 15, 1979, when approximately 46 bottlers were hired. *411 Plaintiffs' Ex. 29. During that period, it was possible that a bottler applicant could be hired within four days of his application. Voisey deposition, pp. 63-64. Bottlers hired on April 15, 1979, earned between $2,449.19 and $3,413.52 from defendant. Those bottlers apparently were laid off and have not worked since sometime in 1980. Second Stipulation of Uncontested Facts.
41. When Griffin applied for employment with defendant, he was unemployed and remained so until late 1979. In addition, it appears from the attendance calendars of the bottlers hired on April 15, 1979, that all of the work available for them was on weekends. Thus, Griffin could have returned to work at his other job and continued to work weekends for defendant. Griffin is entitled, therefore, to back pay in the amount of $3,413.52.
42. Easley has been unemployed since his application with defendant, despite efforts to find other employment. None of the other income received by Easley can properly be considered in mitigation of damages with respect to the period in which he would have been available to work for the defendant. Resolving uncertainties in Easley's favor as to what he would have earned from the defendant, he is entitled to back pay in the amount of $3,413.52.
43. Plaintiffs substantiated their entitlement to an award of compensatory damages for mental or emotional distress solely by means of their personal testimony. Murphy testimony (Tr. 2-16, 2-23 to 2-29); Griffin testimony (Tr. 2-45 to 2-46, 2-66 to 2-69); Easley testimony (Tr. 2-88 to 2-89, 2-116 to 2-117). The Court will award each plaintiff the sum of $500 for such injuries.

F. Attorneys' and Expert Witness Fees

44. A reasonable attorneys' fee for plaintiffs' counsel herein consists of compensation at reasonable hourly rates for all time reasonably spent in the prosecution of plaintiffs' claims, plus enhancement of 33%.
45. The Court finds that a reasonable hourly rate for plaintiffs' lead counsel is $75.00 per hour. Plaintiffs' counsel and his firm specialize generally in civil rights litigation, and in employment discrimination litigation in particular. Plaintiffs' counsel is most efficient when working in this area and should receive a higher rate than in other matters in which he has less knowledge and experience. No hourly fee has been paid to counsel by the plaintiffs; counsel has been dependent solely upon an award of attorneys' fees for compensation in the event of a successful outcome of this action. Plaintiffs' counsel's former partner, Mary Anne Sedey, also contributed to the prosecution of plaintiffs' case without any compensation from them, and her time too should be compensated at the rate of $75.00 per hour. In addition, the time of a paralegal, normally billed at the rate of $25.00 per hour, is compensable at that rate. Chackes testimony (Tr. 2-140 to 2-146).
46. Plaintiffs' attorneys spent a total of 202.8 hours in the prosecution of this case through the last day of trial. An additional 44.3 hours was spent on post-trial matters, primarily consisting of an exhaustive post-trial brief, for a total of 247.1 hours of attorneys' time. Paralegal services constituted 39.1 hours on the case.
47. Despite defendant's contentions to the contrary, the time expended by counsel and the time expended for paralegal services was reasonably necessary for the proper prosecution of this case. Chackes testimony (Tr. 2-145); Plaintiffs' Post-Trial Submission Regarding Attorneys' Time; Plaintiffs' Supplemental Submission Regarding Attorneys' and Expert Witness Fees. Applying the reasonable hourly rates set forth above to those hours results in attorneys' fees of $18,532.50.
48. Enhancement by 33% of the $18,532.50 in fees to which plaintiffs' counsel are reasonably entitled is appropriate under the circumstances of this case for the reasons hereinafter set forth. (¶ 31, infra). Thus, the attorneys' fees should be enhanced by the sum of $6,115.73, for a total award of attorneys' fees in the sum of $24,648.23.
*412 Applying the hourly rates set forth above for paralegal services to the hours engaged for such services results in paralegal fees in the sum of $977.50. Counsel are also entitled to recover such amount.
Accordingly, plaintiffs' counsel will be awarded the total sum of $25,625.73 for attorney and paralegal fees.
49. Plaintiffs seek recovery of the sum of $2,175.00 for expert witnesses Decker and Breaugh. The testimony of those experts was reasonably necessary to prepare and present the plaintiffs' case. The Decker analyses and testimony established the adverse impact of the bottler's test and the disparities in hiring rates between black and white bottler applicants. The Breaugh analyses and testimony established the disparities in the scheduling of bottler applicants for testing and the fact that blacks had actually applied earlier than whites. In addition, Breaugh refuted defendant's minimal evidence regarding the validity of its test and established numerous ways in which it was lacking. The time and rates reflected by plaintiffs' counsel's submission are fair and reasonable. Under all of the circumstances of this case, it is appropriate that expert witness fees in the sum of $2,175.00 be awarded to plaintiffs to be fully paid by defendant. Chackes testimony (Tr. 2-145 to 2-146); Plaintiffs' Supplemental Submission Regarding Attorneys' and Expert Witness Fees.

Conclusions of Law
1. This Court has jurisdiction over the claims of the plaintiffs under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f). Plaintiffs satisfied the procedural requirements of Title VII by filing charges of discrimination with the EEOC and by receiving and acting upon the EEOC's notices of right to sue. Id.; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973). See 42 U.S.C. § 1981; see also 28 U.S.C. § 1343.
2. Plaintiffs submitted evidence concerning both "disparate treatment" and "disparate impact" theories of discrimination. Under the theory of disparate treatment,
... The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. (citations omitted.) ...
Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.... Proof of discriminatory motive, we have held, is not required under a disparate-impact theory. Compare, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 430-432 [91 S.Ct. 849, 853-854, 28 L.Ed.2d 158], with McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-806 [93 S.Ct. 1817, 1824-1826, 36 L.Ed.2d 668].... Either theory may, of course, be applied to a particular set of facts.
International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).
3. All three plaintiffs claim that defendant intentionally discriminated against them and other black applicants for employment because of their race, in violation of both Title VII and § 1981. Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), provides:
(a) It shall be an unlawful employment practice for an employer
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment *413 opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 1981 provides in pertinent part:
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, ... as is enjoyed by white citizens, ....
4. Both statutes are enforceable in a civil action against a private employer. Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 458, 460, 95 S.Ct. 1716, 1719, 1720, 44 L.Ed.2d 295 (1975).
5. The principles established for the order and allocation of proof in Title VII cases are also applicable to § 1981 actions. Setser v. Novack Investment Co., 657 F.2d 962, 967 (8th Cir.) (en banc), cert. denied, 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981).
6. The following elements relative to production and proof apply in hiring discrimination actions:
The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. (footnote omitted.)
McDonnell Douglas Corp. v. Green, supra 411 U.S. at 802, 93 S.Ct. at 1824. This is not a rigid test but requires that a plaintiff, at the least, raise an inference of discrimination which, if unexplained, would make it more likely than not that unlawful acts had been committed. Id. at 802 n. 13, 93 S.Ct. at 1824 n. 13; Furnco Construction Corp. v. Waters, 438 U.S. 567, 575-76, 98 S.Ct. 2943, 2948-49, 57 L.Ed.2d 957 (1978).
7. In this action, plaintiffs have raised the rebuttable presumption of unlawful discrimination by showing that they are black individuals, that they applied for positions with the defendant when it was seeking and hiring applicants, that they were qualified to do the entry-level, non-skilled work involved, and that they were rejected despite those qualifications while others similarly qualified were hired. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); Wells v. Gotfredson Motor Co., Inc., 709 F.2d 493, 495 (8th Cir. 1983).
8. Similarly, statistical evidence may demonstrate a pattern or practice of intentional discrimination. E.g., Hazelwood School District v. United States, 433 U.S. 299, 307-08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); International Brotherhood of Teamsters v. United States, supra 431 U.S. at 339-40 n. 20, 97 S.Ct. at 1856 n. 20. Under the proper circumstances, statistics may, as a matter of law, establish a violation of Title VII. Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir.1970) (class action). They may also be probative of individual employee allegations where they are based on a satisfactory universe of data. Harper v. Trans World Airlines, Inc., 525 F.2d 409, 412 (8th Cir.1975); Noraine v. Western Electric Co., 507 F.2d 590, 594 (8th Cir.1974).
9. In evaluating statistical disparities, the Court must determine whether the disparity is likely to be the result of racial discrimination or chance. The Supreme Court has held that differences of two or three standard deviations are statistically significant, such that the likelihood of the difference occurring by chance may be disregarded. Castaneda v. Partida, 430 U.S. 482, 496-97 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); Hameed v. Iron Workers Local Union No. 396, 637 F.2d 506, 513 n. 8 (1980). Here, the gross disparities between the percent of blacks hired and the percent of blacks in defendant's applicant pool both before and after the test hurdle, and the discriminatory manner in which *414 defendant scheduled applicants for testing, clearly show that defendant was intentionally limiting the number of black bottlers it hired. See ¶¶ 14, 18, and 19, supra.
10. The findings and conclusions of the EEOC are admissible in this action pursuant to Fed.R.Evid. 803(8)(C). Chandler v. Roudebush, 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 1960 n. 39, 48 L.Ed.2d 416 (1976). The appropriate weight to be accorded such findings is within the sound discretion of the Court. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 60 n. 21, 94 S.Ct. 1011, 1025 n. 21, 39 L.Ed.2d 147 (1974). In connection with plaintiff Murphy's charge, the EEOC determined that defendant discriminated against her because of her race. The EEOC also concluded, as the statistical evidence strongly suggests, that defendant intentionally limited the percentage of black bottlers it hired despite the large percentage of black bottler applicants. Plaintiffs' Ex. 9.
11. In order to rebut the presumption of discrimination created by plaintiffs' evidence, defendant must articulate a legitimate nondiscriminatory reason for its refusal to hire plaintiffs. McDonnell Douglas Corp. v. Green, supra 411 U.S. at 802, 93 S.Ct. at 1824.
12. The defendant failed to articulate any legitimate nondiscriminatory reason for its failure to hire plaintiff Murphy and therefore judgment must be entered in her favor. Texas Department of Community Affairs v. Burdine, supra 450 U.S. at 254, 101 S.Ct. at 1094.
13. Plaintiffs Easley and Griffin were rejected because of their failure to pass defendant's discriminatory pre-employment test. Because the test was instituted with knowledge of its adverse impact, and since the test clearly is not valid, it cannot provide a legitimate defense. Moreover, the unrebutted and unexplained statistical evidence regarding defendant's overall hiring practices and scheduling of bottlers for testing, which resulted in the exclusion of most of the black applicants, compels a finding of intentional racial discrimination as to all three plaintiffs.
14. Under the disparate impact theory of discrimination, a selection device such as defendant's written pre-employment test is unlawful under Title VII where it has an adverse impact on a racial minority and cannot be shown by the employer to be justified by business necessity. Hameed v. Iron Workers Local Union No. 396, supra at 512-13. No discriminatory motive need be shown in a disparate impact case under Title VII. Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). The disparities which resulted under the facts of this case make it clear that the test program had a material adverse impact on black applicants, as detailed in the findings of fact stated herein. See Firefighters Institute for Racial Equality v. City of St. Louis, 616 F.2d 350, 356-57 (8th Cir.1980).
15. Once a significant adverse impact is shown, the burden of persuasion shifts to the employer to demonstrate that the test is mandated by business necessity. Hameed v. Iron Workers Local Union No. 396, supra at 513; Hawkins v. Anheuser-Busch, Inc., 697 F.2d 810, 815 (8th Cir.1983). The defendant carries a heavy burden in establishing this defense. It must show that the test program bears a manifest relationship to the employment concerned.
A discriminatory employment practice cannot be "justified by routine business considerations;" the employer must demonstrate that there is a "compelling need * * * to maintain that practice." Kirby v. Colony Furniture Co., Inc., supra, 613 F.2d [696,] at 706 n. 6 [(8th Cir.1980)]. (Emphasis in original.)
Id. at 815; see Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977).
16. The Eighth Circuit has indicated its approval of the testing validation requirements promulgated by the EEOC as a means of determining whether the defendant has met its burden under the business necessity defense. Firefighters Institute for Racial Equality v. City of St. Louis, 549 *415 F.2d 506, 510-13 (8th Cir.), cert. denied, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977).
17. Defendant failed to prove the validity of its test under the law in this Circuit and under the Uniform Guidelines on Employee Selection Procedures. In the Firefighters case, the Eighth Circuit recognized that, "Constructing a content valid exam and proof of its validity requires as a first step a thorough analysis of the job to be performed." Id. at 511. Defendant failed to establish that such a job analysis has been performed. See ¶¶ 28 and 29, supra. And, as in Firefighters, this test is not content-valid because it fails to measure important job attributes and skills. It purports to measure only six of 13 work factors deemed by the defendant to be necessary to successful job performance and fails to measure the single most important factor. These and other deficiencies render the test invalid as a selection device. See ¶¶ 27 through 34, supra.
18. Because defendant refused to hire Easley and Griffin as bottlers due to their failure to pass its pre-employment test, their rights under Title VII were violated.
19. Under Title VII, courts are authorized to enjoin unlawful employment practices and to order such affirmative relief, including back pay and reinstatement, as the court deems appropriate. 42 U.S.C. § 2000e-5(g).
An individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages. (Citations omitted.)
Johnson v. Railway Express Agency, Inc., supra 421 U.S. at 460, 95 S.Ct. at 1720.
20. Under both statutes, prevailing plaintiffs are presumptively entitled to back pay to make them whole and to eliminate as far as possible the effects of defendant's unlawful discrimination. Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Plaintiffs' obligation is to prove the gross amount of back pay owed them. Paxton v. Union National Bank, 688 F.2d 552, 574 (8th Cir.1982). Unrealistic exactitude is not required and uncertainties in determining what plaintiffs would have earned but for the defendant's unlawful conduct are to be resolved in plaintiffs' favor. Wells v. Meyer's Bakery, 561 F.2d 1268, 1273 (8th Cir. 1977); Stewart v. General Motors Corp., 542 F.2d 445, 452 (7th Cir.1976). The defendant bears the burden to rebut plaintiffs' proof of damages and show any necessary mitigation of injuries. DiSalvo v. Chamber of Commerce of Greater Kansas City, 568 F.2d 593, 598 (8th Cir.1978).
21. Applying these legal standards to the facts of record, plaintiffs will be awarded the following amounts of back pay: Patricia Murphy  $12,531.19; Jimmy Easley  $3,413.52; and Andre Griffin  $3,413.52.
22. Under the circumstances of this action, plaintiffs are also entitled to and will be awarded prejudgment interest at the rate of 9% per annum. E.g., Crawford v. Roadway Express, Inc., 485 F.Supp. 914, 925 (W.D.La.1980).
With respect to plaintiff Murphy, interest shall be calculated from December 31, 1981, the date on which plaintiff's back pay would have fully accrued under the award of this Court, to the date of judgment herein.
With respect to plaintiffs Easley and Griffin, prejudgment interest shall accrue from July 1, 1980, to the date of judgment.
23. Under the law of this Circuit, damages for emotional harm are to be presumed where the plaintiff establishes an infringement of substantive constitutional rights. Specific proof of out-of-pocket loss and medical testimony, although relevant, are not necessary to support such an award. A plaintiff's own testimony may stand as the sole evidence sufficient to establish humiliation or mental distress. Williams v. Trans World Airlines, Inc., 660 F.2d 1267, 1272-73 (8th Cir.1981). Accordingly, each of the plaintiffs will be awarded the sum of $500 in damages for emotional distress.
*416 24. To the extent possible, the prevailing plaintiffs in a discrimination case should be made whole for the consequences of defendant's unlawful conduct. See Albemarle Paper Co. v. Moody, supra; see, e.g., Locke v. Kansas City Power and Light Co., 660 F.2d 359, 369 (8th Cir.1981). In Title VII cases, the courts have a duty to look beyond the individual plaintiff's right to relief and put an end to discriminatory policies and practices where they are found. Peltier v. Fargo, 533 F.2d 374, 379-80 (8th Cir.1976); see also Saracini v. Missouri Pacific R.R. Co., 431 F.Supp. 389, 395-96 (E.D. Ark.1977).
25. Thus, injunctive relief prohibiting the continuation of defendant's discriminatory hiring practices is appropriate. The defendant will be enjoined from discriminating on the basis of race and from using the pre-employment test here in question or any similar test or method of hiring which results in racially discriminatory employment selection and which is not valid under the EEOC guidelines.
26. In this case, plaintiffs are entitled to the jobs they were denied because of their race. Defendant will be directed to provide such employment together with all seniority rights and benefits to which plaintiffs would be entitled in accordance with the award of back pay specified herein with respect to each of them.
27. "The prevailing party in a Title VII action is entitled to an award of reasonable attorneys' fees." Hameed v. Iron Workers Union Local No. 396, supra, and authorities cited therein. Such fee awards are computed in accord with the "lodestar" method approved within this Circuit. Cleverly v. Western Electric Co., 450 F.Supp. 507, 511-12 (W.D.Mo.1978), aff'd, 594 F.2d 638, 642 (8th Cir.1979). The standards for determining the amount of attorneys' fees are set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.1974).
28. The Eighth Circuit expressly disapproved "the mechanical division of claimed hours into those expended on issues on which the plaintiff ultimately prevailed and those expended on issues on which the plaintiff did not...." Brown v. Bathke, 588 F.2d 634, 637 n. 5 (8th Cir.1978). Defendant objects to inclusion of the time spent on plaintiffs' partial summary judgment motion. Where, as here, the non-prevailing claim was "reasonably calculated to advance a client's interest, [attorneys' fees] should not be denied solely because the claim did not provide the precise basis for relief granted. Id. at 637; see, e.g., Paschall v. Kansas City Star Co., 695 F.2d 322, 336-37 n. 18 (8th Cir.1982); Planned Parenthood Assoc. v. Ashcroft, 655 F.2d 848 (8th Cir.1981). Specifically, counsel's efforts in connection with summary judgment were interrelated and entirely relevant to plaintiffs' individual claims. Marion v. Barrier, 694 F.2d 229, 232 (11th Cir.1982). See Hensley v. Eckerhart, ___ U.S. ___, ___, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).
29. Plaintiffs' counsel are attempting to recover attorneys' fees based on the following hourly rates:

 Attorney Rate
 Kenneth M. Chackes $80.00
 Mary Anne Sedey 80.00
 Michael J. Hoare 80.00
 Margaret M. Serrano (paralegal) 25.00

The Court finds $75.00 to be a reasonable hourly rate of compensation for counsel fees under the circumstances. See Jorstad v. I.D.S. Realty Trust, 643 F.2d 1305, 1313 (8th Cir.1981). A reasonable rate of compensation for paralegal services herein is $25.00 per hour. Having considered all appropriate factors under Johnson v. Georgia Highway Express, Inc., supra at 717-19, together with the objections of counsel for the defendant, the Court will award plaintiffs' counsel's fees in the amounts outlined herein. See ¶ 45, supra.
30. Plaintiffs' attorneys also seek enhancement of the lodestar amount by a factor of 50%. In DiSalvo v. Chamber of Commerce of Greater Kansas City, supra, a Title VII case, the Eighth Circuit affirmed the district court's award of a 25% enhancement of the attorney's lodestar figure. Based upon the entire record in this cause, *417 and in particular the skills of plaintiffs' attorneys and the acknowledged expertise of counsel required for the successful prosecution of this case, the results obtained on behalf of plaintiffs, the clear vindication of the public interest contemplated with respect to actions of this nature, the contingent character of the compensation available, and the thorough and diligent efforts made in plaintiffs' interest amply demonstrated prior to, during, and after trial, the Court will enhance the lodestar figure of $18,532.50 by a factor of 33%, or $6,115.73, for a total award including paralegal fees of $25,625.73. See id. at 597; Jones v. Diamond, 636 F.2d 1364, 1382 (5th Cir.1981).
31. The recovery of fees for expert witnesses in civil rights cases is a matter of discretion with the district court. Such fees generally are recoverable where the court finds that the participation of the experts was helpful to the court and reasonably necessary to the preparation or presentation of plaintiffs' case. E.g., Thornberry v. Delta Air Lines, Inc., 676 F.2d 1240, 1244-45 (9th Cir.1982); see Paschall v. Kansas City Star Co., supra at 338-39.
Those standards are met herein and the plaintiffs should recover the fees charged by their expert witnesses  $2,175.00. See ¶ 48, supra.
The Court finds that, in light of all the evidence presented, an award of punitive damages would be inappropriate under the circumstances.

JUDGMENT
In accordance with the memorandum opinion of the Court filed this day, which is incorporated into and made a part of this judgment,
IT IS HEREBY ORDERED AND ADJUDGED that plaintiffs Jimmy Easley and Andre Griffin shall recover of the defendant, Anheuser-Busch, Inc., an award of back pay in the sum of $3,413.52 each, together with prejudgment interest thereon at the rate of 9% per annum from July 1, 1980 to the date of this judgment, in the amount of $972.86, for a total sum of $4,386.38 each, and post-judgment interest on the principal sums at the rate per annum allowable by law, and costs.
IT IS HEREBY FURTHER ORDERED AND ADJUDGED that plaintiff Patricia Murphy shall recover of the defendant, Anheuser-Busch, Inc., an award of back pay in the sum of $12,531.19, together with prejudgment interest thereon at the rate of 9% per annum from December 31, 1981, to the date of this judgment, in the amount of $1,879.68, for a total sum of $14,410.87, and post-judgment interest on the principal sum at the rate per annum allowable by law, and costs.
IT IS HEREBY FURTHER ORDERED AND ADJUDGED that plaintiffs Jimmy Easley, Andre Griffin, and Patricia Murphy shall recover of the defendant, Anheuser-Busch, Inc., an award of compensatory damages for emotional distress in the sum of $500 each, and interest thereon from the date of this judgment at the rate per annum allowable by law.
IT IS HEREBY FURTHER ORDERED AND ADJUDGED that plaintiffs' counsel, Kenneth M. Chackes, Mary Anne Sedey, and Michael J. Hoare, shall recover of the defendant, Anheuser-Busch, Inc., an award of attorney's and paralegal's fees in the total sum of $25,625.73, with interest thereon from the date of this judgment at the rate per annum allowable by law.
IT IS HEREBY FURTHER ORDERED AND ADJUDGED that plaintiffs Jimmy Easley, Andre Griffin, and Patricia Murphy shall recover of the defendant, Anheuser-Busch, Inc., one award for expert witness fees in the sum of $2,175, with interest thereon from the date of this judgment at the rate per annum allowable by law.
IT IS HEREBY FURTHER ORDERED AND ADJUDGED that defendant, Anheuser-Busch, Inc., its agents, consultants, contractors, and employees be and the same are permanently enjoined from engaging in employment discrimination on the basis of race, and more particularly, from instituting or using the pre-employment testing program which is the subject of this action, or any similar test, program, or method of *418 hiring which results in racially discriminatory hiring practices, and from instituting or using any such test program or method of hiring which is invalid under the Uniform Guidelines on Employee Selection Procedures promulgated by the Equal Employment Opportunity Commission of the United States, 29 C.F.R. § 1607.1, et seq. (1982).
IT IS HEREBY FURTHER ORDERED AND ADJUDGED that the defendant, Anheuser-Busch, Inc., shall provide, forthwith, to each plaintiff herein, employment as a bottler in its St. Louis, Missouri, brewery, at currently prevailing wages and with such seniority rights and accompanying benefits as would be appropriate to an employee having already accrued work experience commensurate with the award of back pay made to each plaintiff under this judgment.