[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case is a legal base between two optometrists who no CT Page 237 longer see eye-to-eye. In the opening round of their fight, the parties have focused on whether it would be appropriate for this court to issue a temporary injunction barring one doctor from competing with the other. For the reasons discussed below, the court concludes that the requested temporary in junction should not issue.
The optometrists in question are Albert Germain and Howard Gottlieb, who are the respective heads of the plaintiff and defendant corporations. Gottlieb is something of an entrepreneur and owns thirteen stores that license the name of New England Eyecare. Germain is a younger man who go' his professional star' under Gottlieb in a store located at 835 Wolcott Street in Waterbury, where he (Germain) still practices.
Gottlieb and Germain began as what they called partners at 835 Wolcott Street in 1983. The business was then called New England Eyecare of Waterbury, P.C. This business, as the name suggests, was a professional corporation, of which Gottlieb owned 80% of the stock and Germain 20% (for which he paid Gottlieb $20,000). In 1984, Germain purchased an additional 29% of the stock for consideration (cash and a note) totaling $70,000.
On February 29, 1988, Gottlieb sold the remaining 51% of the business to Germain for consideration of approximately $154,000 in cash and the assumption of approximately $100,000 debt. The terms of this sale are set forth in a Stock Purchase Agreement signed by the parties and entered into evidence as plaintiff's exhibit 1. This was not a contract of adhesion. Both parties were represented by attorneys, and the terms were the result of vigorous negotiation. For purposes of this case, the following provisions of this agreement are particularly important:
Paragraph 7(a). Gottlieb licensed to Germain the right to use the trade name "New England Eyecare" for 2-1/2 years (that is, until. August 29, 1990). In return for this license (this is in addition to the consideration mentioned above) Germain agreed to pay Gottlieb a bi-weekly fee equal to 2% of his gross sales.
Paragraph 7(b). 120 days in advance of the termination of the 2-1/2 year period just mentioned (that is, by sometime in April 1990), Germain had the option to renew the license for another 2-1/2 years.
Paragraph 7(c). Germain agreed to pay a late fee of $25 a day for each day a licensing fee remained unpaid.
Paragraph 8. Gottlieb agreed to provide marketing services (budgeting and advertising) to Germain for 2-1/2 years in return for an additional bi-weekly fee of 1% of gross sales for the first CT Page 238 year and 2% of gross sales thereafter Germain agreed to pay a late fee of $25 a day for each day a marketing fee remained unpaid.
Paragraph 15. For a period of four years "provided [Germain] is not in default hereunder" Gottlieb agreed not to open a competing optometric practice in Waterbury.
Paragraph 20. The Agreement is to be governed by Connecticut law.
Paragraph 21. The Agreement constitutes the entire agreement between the parties and may only be modified in writing.
Paragraph 22. (appearing, by reason of a typographical error, as paragraph 19). "The waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach of the same or any other provision of this Agreement."
The first fourteen months after this Agreement was signed were uneventful. In May 1989, however, Germain began to experience serious financial difficulties. Between then and January 1990, he missed a total of twenty bi-weekly licensing and marketing payments. (Some sporadic payments were made.) The late fees for these payments totaled over $11,000. This was plainly a serious situation, and Germain acknowledges that he was in default during this period. Gottlieb, however, exercised considerable patience and, as far as the record indicates, made no threatening move until January 16, 1990. On that date, Gottlieb wrote Germain a letter (plaintiff's exhibit 6) listing the then-unpaid licensing, marketing and late fees. The letter concluded with the following sentence: "The penalties will be waived if payment is made in full or suitable arrangements are made by January 24, 1990."
This letter was received by Germain on January 18. (All dates an now 1990 dates.) Later that day, he made a telephone call to Gottlieb which lasted 17 minutes. The duration is established by Germain's telephone bill (plaintiff's exhibit 10) and is about the only precise thing that can be said about the conversation since the memories of both parties about what must have been for each a discussion of exceedingly great importance became curiously deficient once the parties reached the witness stand. Gottlieb, who was the more credible witness on this point, remembered very little of the conversation. He testified that he never said that any of the prior defaults would be waived and that if someone had said something to him about a payment plan, he would have remembered it Gottlieb is obviously an astute businessman (not even Germain contests that), and the court is CT Page 239 inclined to believe him on this latter point.
Germain's memory of this conversation differs significantly. Unfortunately, his memory a party given moment on the witness stand differed significantly from his memory the next moment. Questions propounded by the court only added to the variety of answers. A final improved version was added after a mid morning recess. In his most optimistic version, he testified that Gottlieb had told him that the letter was just a "formality" that he (Gottlieb) wasn't going to hold him to the date in the letter, and that payment of the late fees would be waived. The court does not find this testimony credible, although it does not doubt (in light of subsequent events) that Germain did make various representations that he would endeavor to pay and that Gottlieb encouraged prompt payment
On January 20, Germain wrote Gottlieb a check for $2,402. (Plaintiff's exhibit 11.)
On January 31, an employee of Gottlieb's wrote Germain a letter (plaintiff's exhibit 7) thanking him for his "partial payment of past due royalties" and requesting an accounting of sales for the still-unpaid weeks and a payment plan by February 15. The letter concluded, "As a formality, you will be notified of your default under the tens of your contract, under separate cover."
On February 4, Germain wrote Gottlieb two checks — one business and one personal — totaling $4,257. (Plaintiff's exhibit 12-13.) All parties agree that this was sufficient to pay all of Germain's underlying debt except the approximately $11,000 in late fees.
The next three months were, at least as far as the evidence submitted to this court indicates, amazingly uneventful. There is undisputed evidence that, following his February 4 payments, Germain made faithful and timely payments of his licensing and marketing fees right up to August 29, when his obligation to make those payments ceased. There is also undisputed evidence that Gottlieb accepted these payments without reservation. Indeed, the next significant event was a nonevent. In late April the deadline for Germain to renew his licensing agreement passed without any activity on his part. This nonevent seemed to act as a catalyst for Gottlieb.
On May 24, Gottlieb wrote to Germain remarking on the fact that the licensing agreement had not been renewed and ordering him to cease using the name New England Eyecare by August 29. He further advised Germain that he owed $12,550 in late fees and that the letter "shall be notice of your default under the Agreement CT Page 240 due to the non-payment" of those fees. (Plaintiff's exhibit 8.)
An even more ominous letter from Gottlieb followed on July 30. It began by remarking that, "[a]s of this date there has been no cure of the default" stated in the May 24 letter. Gottlieb ordered Germain to cease using the name New England Eyecare effective August 29 and to vacate the premises at 835 Wolcott Street. The letter then stated that because of the default, "New England Eyecare shall be released from the [noncompetition] provision of Section 15 [of the Agreement] and shall be permitted to license the name New England Eyecare within the City of Waterbury, Connecticut effective August 29." (Plaintiff's exhibit 9.)
In late August, Gottlieb sent a flyer (Plaintiff's exhibit 3) to area optometrists seeking a new licensee for New England Eye Care in Waterbury.
In November, Gottlieb opened a New England Eyecare Store at 625 Wolcott Street in Waterbury — about half a mile from Germain' s store, which had, in the meantime changed its name to New Insight Family Eyecare. Gottlieb's new store is heavily promoted, both by newspaper advertisements (plaintiff's exhibit 4) and direct mailings to former New England Eyecare Customers (plaintiff's exhibit 5).
There is undisputed evidence that, in addition to Gottlieb's new store, there are four other eyecare stores within three-quarters of a mile of Germain's store. There is no evidence whatsoever on the record of any actual negative impact of Gottlieb's new store on Germain's business, although it would be surprising if some negative impact did not exist
As of the date of the hearing (held on December 17 and 20), the late fees had not been paid. Germain apparently also owes Gottlieb approximately $860 for some contact lenses. (Defendant's exhibits 1 and 2.)
The court must initially determine the proper standard for the issuance of a temporary injunction Connecticut law on this subject is somewhat rudimentary. Conn. Gen. Stat Sec. 52-473 (b) requires a clear showing of "irreparable loss or damage" before a temporary in junction may be issued without notice to the adverse party, but in regard to temporary injunctions requested after notice and hearing[1] — as is the case here — the legislature has chosen a discrete silence. The Connecticut Supreme Court has never directly addressed this latter subject either, although it has made some noteworthy statements in analogous cases. In Olcott v. Pendleton, 120 Conn. 292, 22 A.2d 633 (1941), the court explained the standards that should govern a temporary injunction CT Page 241 issued on the pleadings as follows:
 In deciding whether it should be granted or, if granted, whether it should be continued or dissolved, the court is called upon to balance the results which may be caused to one party or the other, and if it appears that to deny or dissolve it may result in great harm to the plaintiff and little to the defendant, the court may well exercise its discretion in favor of granting or continuing it, unless indeed, it is very clear that the plaintiff is without legal right
Id. at 295. The requirement that is be "very clear that the plaintiff is without legal right," the court later explained,
"necessarily requires consideration of the probable outcome of the litigation." Griffin Hospital v. Commission on hospitals and Health Care, 196 Conn. 451, 457, 493 A.2d 229 (1985). Griffin Hospital reviewed a number of Superior Court decisions involving temporary injunctions, id. at 457-58, but it refrained from taking any detailed position on the subject itself since it was considering a stay of an administrative decision and was looking to temporary injunction cases only by way of analogy. Cf. Hartford Division, Emhart Industries, Inc. v. Amalgamated Local Union 376, U.A.W., 190 Conn. 371, 393-94, 461 A.2d 422 (1983) (discussing the specific statutory criteria set forth in Conn. Gen. Stat. Sec.31-115 governing temporary injunctions in labor dispute cases).
The United States Supreme Court has also spoken little on the subject, although it did advise us in Doran v. Salem Inn, Inc.,422 U.S. 922, 931 (1975), that, "The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits."
The federal courts of appeal have, in contrast, developed highly articulated standards to guide the federal district courts in deciding whether to issue preliminary injunctions. Each federal circuit has a somewhat different formulation, see 7 J. Moore, J. Lucas K. Sinclair, Moore's Federal Practice par. 65.04 [1] (2d ed. 1989), but the test enunciated by the Second Circuit is particularly useful, both because it is likely to be familiar to litigants in Connecticut and because it effectively synthesizes the balancing approach of Olcott with the two-pronged test of Doran. Under the well settled law of the Second Circuit, CT Page 242
 [T]o succeed on a motion for a preliminary injunction, the moving party has the burden of establishing: (a) irreparable harm; and (b) either (1) probable success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary in unactive relief.
Kaplan v. Board of Education, 758 F.2d 256, 259 (2d Cir. 1985). Accord Loveridge v. Pendleton Woolen Mills, Inc., 788 F.2d 914,916 (2d Cir. 1986). The court concludes that is appropriate to use the Second Circuit test here.
Under this standard, a party seeking a temporary injunction must first establish irreparable harm. Whether harm is "to be viewed by a court of equity as `irreparable' or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary measure of the loss suffered." Robertson v. Lewie, 77 Conn. 345, 346, 59 A. 409 (1904). "Irreparable injury vs one that cannot be redressed through a monetary award. Where money damages are adequate compensation a preliminary in junction should not issue." JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75,79 (2d Cir. 1990).
The litigation here is strictly commercial. The plaintiff has no land that will be irreparably destroyed, as in Robertson, of liberty interests that are endangered, as is often the case in civil rights litigation. While business and financial interests may unquestionably merit the protecting of a temporary injunction in appropriate circumstances, those circumstances are not present here. If a damage award will "come too late to save the plaintiff's business," Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir. 1984), the loss to the plaintiff will be irreparable. Germain want's to sell eyeglasses, "not to live on the income from a damages award." Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970). Thus, if Germain established that the competition from Gottlieb was likely to shut down his business, irreparable harm would be shown. But no such showing has been made here. Not only is there not one scintilla of evidence in the record with respect to the actual impact of Gottlieb's new business on Germain, the record clearly establishes that there are four other optometry shops competing with Germain within a three-quarters mile radius of his shop. Although, as noted above, it would be surprising if Gottlieb's new enterprise would not have some negative impact on Germain's business, there is simply no evidence from which the court can CT Page 243 infer that this impact is likely to be ruinous under all of the circumstances.
This is not, moreover, a case where Germain's goodwill will be damaged by an inability to provide his retail customers with New England Eyecare products. Compare, e.g., Reuters Limited v. United Press International, Inc., 903 F.2d 904, 907-09 (2d Cir. 1990). Germain had decided to disassociate himself from new England Eyecare months before Gottlieb's new shop opened. His only complaint is that he has an additional competitor in violation (so he says) of the 1988 Agreement.
In the absence of any evidence indicating that Germain is likely to be put out of business or suffer the loss of goodwill, the court concludes that money damages are likely to be adequate here. It should be remembered that under paragraph 15 of the Agreement, Gottlieb's convenant not to compete runs only for four years even in the absence of default — i.e. until February 24, 1992. Thus, even under the most dire (to him) set of circumstances, Germain will have an additional competitor (one of five within three-quarters of a mile) for an additional sixteen months (November 1990 to February 1992). The court does not intend to imply by this that the impact is likely to be small, for it has no doubt that Gottlieb will be a formidable competitor. But, at bottom, Germain is simply contending that his business is likely to be less profitable. Even if he "were able to prove such an injury. . .such a loss would be compensable in money damages. . . .[W]here money damages are adequate compensation, a preliminary injunction will not issue since equity should not intervene when there is an adequate remedy at law." Loveridge v. Pendleton Woolen Mills, Inc., supra, 788 F.2d at 917-18.
Although this is technically the end of the mater, the court adds that if it were to proceed to a consideration of the merits of the case (based on the evidence submitted to it thus far) and the balance of the hardships, the plaintiff would fare no between Germain has not established that Gottlieb waived the late fees owed to him in their telephone conversation of January 18, 1990. He does have an argument, based on Gottlieb's acceptance of his licensing and marketing fees in the aftermath of the February 4, 1990, payments, that the late fees were waived by that acceptance, see Grippo v. Davis, 92 Conn. 693, 696, 104 A. 165 (1918); Bronson v. Leibold, 87 Conn. 293, 297, 87 A. 979 (1913). The evidentiary hearing did not, however, focus on this matter, and additional evidence may remain to be presented at a full trial on the merits.[2] But it is quite clear in any event, that the balance of hardships tips decidedly toward Gottlieb. If a temporary injunction is denied, Germain will doubtless suffer a loss of income, but there is no reason to believe, based on this record, that his business will be destroyed. If, however, a temporary CT Page 244 injunction is granted, Gottlieb will, by definition, be put out of business in Waterbury. Although these are doubtless circumstances in which such a temporary injunction would be appropriate, this is not one of them.
The requested temporary injunction is denied.
Dated at Waterbury, this 18th day of January, 1991.
JON C. BLUE JUDGE OF THE SUPERIOR COURT